## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Roy Lewis Lenhardt,

              Plaintiff,

v.

Hartford Insurance Company of the
Midwest,

              Defendant.

Case No.:    ( / )

**COMPLAINT**

Plaintiff, Roy Lewis Lenhardt, for his Complaint against Defendant Hartford Insurance Company of the Midwest, states and alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1.    Plaintiff Roy Lewis Lenhardt (hereinafter "Plaintiff") is and was at all times material herein a resident of the City of St. Cloud, County of Stearns, State of Minnesota.

2.    Defendant Hartford Insurance Company of the Midwest (hereinafter "Defendant") is a subsidiary of the Hartford Insurance Company in Hartford, Connecticut and was at all times material herein an insurance company providing long-term disability benefits to certain corporations in the Midwest, including but not limited to, Minnesota, for the benefit of their employees.

3.    Upon information and belief, Defendant's principal place of business is located at 501 Pennsylvania Parkway, Suite 400, Indianapolis, Indiana with a local office located at 1010 Dale St., City of St. Paul, State of Minnesota.

11.     On or about early February 2015, Plaintiff began suffering from a series of serious medical issues which presented concurrently. Mr. Lenhardt began experiencing back, neck, shoulder and right knee pain.  These conditions progressively worsened. Plaintiff underwent a cervical fusion procedure in 2015 for disc compression.   In 2015, Plaintiff began receiving radiofrequency ablation and injection treatments.  Plaintiff underwent knee surgery in July 2017. In addition, on January 20, 2022, Plaintiff underwent a second knee surgery for a tear in his meniscus.

12.   Thereafter, Plaintiff's ability to perform the duties of his occupation became progressively difficult.  Plaintiff was subsequently diagnosed with cervical spine, radiculopathy, radiculitis and post-cervical laminectomy syndrome, nerve pain, headache, thoracic pain, and cervical pain and back and knee pain throughout the visit. Plaintiff began treating with a comprehensive pain specialist in Denver, Colorado beginning December 2015.  When that failed to relieve his persistent symptoms, Plaintiff returned to his surgeon for continuing pain and was referred to a pain specialist in February 2015.

13.     As Plaintiff's pain condition did not improve but became worse over time, Plaintiff ceased working in his position with MTech on April 5, 2017.   Plaintiff went on short-term disability due to his medical issues and required additional time off work.    Thus, Plaintiff was unable to perform the essential duties of his own occupation as of November 2, 2017.

14.     Plaintiff he underwent a spinal cord simulator (SCS) procedure where an implant was surgically installed in September 2016.  However, he had to have it removed because it did not work.  Thus, the SCS implant was surgically removed in August 2018.  Plaintiff continues to experience severe nerve pain in his neck and back, with continuous and recurring headaches. Plaintiff is restricted to carrying a maximum of 8 lbs. and is unable to walk or stand for longer than

3

15 minutes.  Plaintiff is unable to sit in a position for longer than 5 -15 minutes.  Plaintiff continues to undergo radiofrequency ablation treatments approximately every six (6) months and monthly injections to manage the pain and his condition.  Plaintiff has been prescribed Oxycontin, muscle relaxers and Lyrica in addition to many other prescription medications in an attempt to address his ongoing symptoms. The prescribed medications produce many side effects which, when added together with the rest of Plaintiff's ongoing medical issues and chronic conditions, render him disabled under the meaning contained in his long-term disability policy with Defendant.  Plaintiff timely requested reconsideration of Defendant's denial of Long Term Disability benefits.

13.     Plaintiff applied for long term disability benefits on November 2, 2017 and was initially approved on January 26, 2018.  However, in a letter dated March 16, 2021, Defendant determined that Plaintiff was no longer eligible for long term disability benefits. A true and correct copy of the March 16, 2021 denial letter is attached hereto as Exhibit A.  On September 9, 2021, Plaintiff requested a review of Defendant's decision.

14.     Defendant claimed that Plaintiff did not meet the policy definition of Disability as of March 16, 2021, due to alleged insufficient proof of disability, even though Plaintiff has been approved for Social Security Disability.

15.     On or about February 23, 2022, Plaintiff submitted to Defendant an updated medical report from his treating physician, Dr. Mark Halstrom, providing additional reasons for his continued eligibility as disabled under the long term disability policy. A true and correct copy of the letter is filed confidentially under seal as Exhibit C.

16.     On or about March 24, 2022, Defendant denied Plaintiff's appeal for re-instatement of long-term disability benefits.  Defendant affirmed the denial of Plaintiff's claim for benefits, on the same grounds as the initial denial and by stating the medical documentation did not support

restrictions and limitations that would render Mr. Lenhardt unable to perform the main duties of any gainful occupation that his training, education, and experience would allow.

17. In a letter dated March 24, 2022, Defendant denied further payment of long-term disability benefits, on the grounds that Plaintiff no longer met the Plan's definition of "disabled." A true and correct copy of this letter is attached hereto as Exhibit B.

18. Defendant reported that an independent physician, Dr. Harry Robinson, reviewed Plaintiff's medical records and opined that Plaintiff was not disabled from any gainful employment. However, Dr. Robinson focused mainly on surveillance video taken of Plaintiff and a 45-minute office visit and failed to consider the totality of Plaintiff's additional medical conditions such as chronic pain, chronic lumbar pain, and the side effects of physician-prescribed pain medications over the course of an 8-hour workday.

19. Defendant also failed to give proper weight to Dr. Halstrom's opinion that Plaintiff cannot work in any occupation due to the combination of Plaintiff's medical conditions and chronic pain problems.

20. Plaintiff has exhausted all additional administrative remedies under long term disability with Defendant's disability policy.

21. As of the date of commencement of this action, Defendant has refused to pay long term disability benefits under the Plan to which Plaintiff is entitled.

## FIRST CAUSE OF ACTION

### CLAIM TO RECOVER BENEFITS AND TO CLARIFY RIGHTS UNDER THE PLAN PURSUANT TO 29 U.S.C. § 1132(a)(1)(B)

22. Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 21 of his Complaint as if fully set forth herein.

23.     Plaintiff fulfilled all conditions for receipt of benefits under the Plan and presented such evidence to Defendant.

24.     Defendant wrongfully denied Plaintiff's claim for benefits under the Plan. Defendant made unsupported factual conclusions, and misconstrued the terms of the Plan, in reaching its determination to deny Plaintiff's claim for benefits.

25.     Defendant's denial of Plaintiff's claim for benefits is a result, at least in part, of the conflict of interest when determining claims under the Plan, and its interest in maximizing its own profitability. The result of this conflict of interest has been demonstrated in a number of ways, including, but not limited to, the following:

(a)     Defendant has refused to consider the impact of all of Plaintiff's medical issues, prescription medications and the side effects therefrom, and the resulting disabilities that the combination of such conditions creates.

(b)     Defendant has refused to consider the opinions of Plaintiff's treating physicians as having a higher level of credibility based on their physical examinations of Plaintiff and in person interviews with Plaintiff regarding his medical conditions.

(c)     Defendant encouraged Plaintiff to apply for Social Security Disability Benefits from the Social Security Administration of the United States Government. However, after Plaintiff filed for such benefits and was awarded such benefits, Defendant benefitted from the offset of such benefits from its payments to Plaintiff for long term disability benefits.

(d) Defendant thereafter collected an "overpayment" from Plaintiff based on Plaintiff's receipt of Social Security Disability benefit payments, yet, Defendant failed to give any credibility or weight to the evidentiary findings of the Social Security Administration regarding Plaintiff's status as a totally disabled individual.

26.     Defendant's denial of Plaintiff's claim for benefits is contrary to the terms of the Plan and contrary to the vast amount of consistent medical evidence and information submitted to Defendant over a period of several months and now years. Defendant's denial of Plaintiff's claim for long term disability benefits under his policy with Defendant is therefore wrongful.

27.     Plaintiff has incurred, and will continue to incur, attorney's fees, costs and expenses in bringing and prosecuting this action. Plaintiff is entitled to an award of such attorney's fees, costs and expenses pursuant to 29 U.S.C. § 1132(g).

WHEREORE, Plaintiff prays that the Court enter judgment in his favor, and against Defendant, as follows:

1.     By entering judgment requiring Defendant, Hartford Insurance Company of the Midwest, to pay Plaintiff all past due benefits due under the Plan, commencing with the first day such benefits were due and continuing through the date of judgment;

2.     By entering judgment clarifying that Plaintiff has fulfilled all the terms and conditions of the Plan for receipt of benefits, exhausted all of his administrative remedies and that Plaintiff is entitled to continue to receive benefits in the absence of evidence supporting the conclusion that Plaintiff's condition has changed such that Plaintiff is no longer totally disabled;

3.     By awarding Plaintiff with his attorney's fees, costs and expenses as provided under 29 U.S.C. § 1132(g).

Respectfully submitted,

Date: August 5,  2022

**RIVER VALLEY LAW, P.A.**

By:  /s/Sarah R. Jewell
Sarah R. Jewell (# 0392268)
183 Seventh Avenue South
Waite Park, MN  56387
Tel. (320) 497-7977
Email: sjewell@rivervalleylaw.com
*Attorney for Plaintiff*

8



**THE HARTFORD**

March 16, 2021

Roy Lenhardt
2603 Stearns Way
Saint Cloud, MN 56303

| | |
|---|---|
| Policy Holder: | Mtech Mechanical Technologies Group, Inc. |
| Claimant: | Roy Lenhardt |
| Insured ID: | |
| Policy Number: | |
| RE: | Long Term Disability |

Dear Mr. Lenhardt:

We are writing to you about your claim for Long Term Disability benefits. These benefits are under the group insurance policy number ▮▮▮▮▮▮ for MTech Mechanical Technologies Group, Inc.

Based on our review of the information currently contained in your claim file, we have determined that you no longer meet the policy definition of Disability as of 03/16/2021.

Your claim file reflects you are receiving Social Security Disability (SSD) benefits. As we discussed with you and explained in the SSD educational tool you received from us, it is possible to qualify for SSD, but no longer continue to qualify for private long-term disability (LTD) benefits from The Hartford. The standards governing these public and private benefits are different in critical ways. In determining entitlement to SSD, the Social Security Administration (SSA) measures your condition against a unique set of federal criteria. By contrast, continued qualification for benefits under your private LTD policy depends in part on the consistent interpretation of the specific terms in that policy. Therefore, while The Hartford considers the SSA's disability determination as one piece of relevant evidence, the SSA's determination is not conclusive. The following will help to explain why The Hartford reached a different conclusion than the SSA regarding disability benefits.

Your Policy states under the Definitions section starting on page 38:

"**Disability or Disabled** means You are prevented from performing one or more of the Essential Duties of:
1) Your Occupation during the Elimination Period;
2) Your Occupation, for the 2 year(s) following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings; and
3) after that, Any Occupation.

Benefit Management Services
Sacramento Disability Claim Office
The Hartford
P.O. Box 14302
Lexington, KY 40512-4302
800-549-6514
Fax (866) 411-5613

Claim ID: 16621064



**EXHIBIT**

**A**

If at the end of the Elimination Period, You are prevented from performing one or more of the Essential Duties of Your Occupation, but Your Current Monthly Earnings are equal to or greater than 80% of Your Pre-disability Earnings, Your Elimination Period will be extended for a total period of 12 months from the original date of Disability, or until such time as Your Current Monthly Earnings are less than 80% of Your Pre-disability Earnings, whichever occurs first. For the purposes of extending Your Elimination Period, Your Current Monthly Earnings will not include the pay You could have received for another job or a modified job if such job was offered to You by Your Employer, or another employer, and You refused the offer.

Your Disability must result from:
1) accidental bodily injury;
2) sickness;
3) Mental Illness;
4) Substance Abuse; or
5) pregnancy.

Your failure to pass a physical examination required to maintain a license to perform the duties of Your Occupation, alone, does not mean that You are Disabled."

"**Any Occupation** means any occupation for which You are qualified by education, training or experience, and that has an earnings potential greater than the lesser of:
1) the product of Your Indexed Pre-disability Earnings and the Benefit Percentage; or
2) the Maximum Monthly Benefit."

"**Pre-disability Earnings** means Your regular monthly rate of pay not counting bonuses, commissions and tips and tokens, overtime pay or any other fringe benefits or extra compensation, in effect on the last day You were Actively at Work before You became Disabled."

"**Indexed Pre-disability Earnings** means Your Pre-disability Earnings adjusted annually by adding the lesser of:
1) 10%; or
2) the percentage change in the Consumer Price Index (CPI-W).

The percentage change in the CPI-W means the difference between the current year's CPI-W as of July 31, and the prior year's CPI-W as of July 31, divided by the prior year's CPI-W. The adjustment is made January 1st each year after You have been Disabled for 12 consecutive month(s), provided You are receiving benefits at the time the adjustment is made.

The term Consumer Price Index (CPI-W) means the index for Urban Wage Earners and Clerical Workers published by the United States Department of Labor. It measures on a periodic (usually monthly) basis the change in the cost of typical urban wage earners' and clerical workers' purchase of certain goods and services. If the index is discontinued or changed, We may use another nationally published index that is comparable to the CPI-W."

Your Policy also states under the Benefits section starting on page 31:

Claim ID: 15921064

**"Termination of Payment:** *When will my benefit payments end?*
Benefit payments will stop on the earliest of:

1) the date You are no longer Disabled;
2) the date You fail to furnish Proof of Loss;
3) the date You are no longer under the Regular Care of a Physician;
4) the date You refuse Our request that You submit to an examination by a Physician or other qualified medical professional;
5) the date of Your death;
6) the date You refuse to receive recommended treatment that is generally acknowledged by Physicians to cure, correct or limit the disabling condition;
7) the last day benefits are payable according to the Maximum Duration of Benefits Table;
8) the date Your Current Monthly Earnings:
   a) are equal to or greater than 80% of Your Indexed Pre-disability Earnings if You are receiving benefits for being Disabled from Your Occupation; or
   b) are greater than the lesser of the product of Your Indexed Pre-disability Earnings and the Benefit Percentage or the Maximum Monthly Benefit if You are receiving benefits for being Disabled from Any Occupation;
9) the date no further benefits are payable under any provision in The Policy that limits benefit duration; or
10) the date You refuse to participate in a Rehabilitation program, or refuse to cooperate with or try:
   a) modifications made to the work site or job process to accommodate Your identified medical limitations to enable You to perform the Essential Duties of Your Occupation;
   b) adaptive equipment or devices designed to accommodate Your identified medical limitations to enable You to perform the Essential Duties of Your Occupation;
   c) modifications made to the work site or job process to accommodate Your identified medical limitations to enable You to perform the Essential Duties of Any Occupation, if You were receiving benefits for being disabled from Any Occupation; or
   d) adaptive equipment or devices designed to accommodate Your identified medical limitations to enable You to perform the Essential Duties of Any Occupation, if You were receiving benefits for being disabled from Any Occupation;
   provided a qualified Physician or other qualified medical professional agrees that such modifications, Rehabilitation program or adaptive equipment accommodate Your medical limitation."

We based our decision to terminate your claim on policy language. All the documents contained in your file were viewed as a whole. This included:

- Employer Statement received on 07/05/2017, completed by Michelle Singer on 06/30/2017;
- Income Benefits Questionaire received on 11/02/2017, signed by you on 11/01/2017;
- Claimant Questionnaire received on 05/13/2020, signed by you on 05/13/2020;

- Attending Physician's Statement received on 05/13/2020, signed by Dr. Halstrom on 02/18/2020;
- Medical records from Steadman Hawkins Clinic Denver for the period of 07/05/2017 to 02/28/2019;
- Medical records from Dr. Barnhart for the period of 03/03/2017 to 01/17/2019;
- Medical records from Dr. Mehlberg for the period of 09/14/2017 to 03/25/2019;
- Medical records from Dr. Elghor for the period of 06/04/2019 to 07/11/2019;
- Medical records from St. Cloud Orthopedic for the period of 05/31/2019 to 06/19/2019;
- Medical records from Center for Pain Management for the period of 07/11/2019 to 07/28/2020;
- Medical records from Dr. Halstrom for the period of 08/23/2019 to 02/14/2020;
- Medical records from Dr. Breyer for the period of 01/16/2020 to 02/06/2020;
- Video surveillance performed on 05/26/2020 and 05/27/2020 and 07/06/2020 and 07/07/2020;
- Surveillance Reports completed on 11/18/2020;
- Personal Interview with Hartford Investigator Jennifer Born on 08/17/2020;
- Independent Medical Exam and Report completed on 07/01/2019 by Dr. Orrin Mann, Board Certified in Occupational, Environmental and Preventative Medicine received on 07/16/2019;
- Independent Medical Exam clarification signed by Dr. Orrin Mann on 07/23/2019, received on 07/24/2019;
- Request for Clarification Letter sent to Dr. Barnhart on 01/29/2019;
- Request for Clarification Letter sent to Dr. Mehlberg on 03/26/2019;
- Response received from Dr. Barnhart signed on 01/31/2019;
- Response received from Dr. Mehlberg signed on 04/02/2019;
- Response received from Dr. Halstrom dated 12/22/2020
- Independent Medical Exam and Report completed on 02/01/2021 by Dr. Harry Robinson, Orthopedic Surgeon, received on 02/24/2021;
- Medical review of your claim file by a Clinical Case Manager on 07/25/2019 and 03/04/2021; and
- Employability Analysis Report completed by a Vocational Rehabilitation Clinical Case Manager on 03/11/2021.

Our records show that your last day of work as Human Resources/Controller at Mtech Mechanical Technologies was 04/04/2017. You became insured under this LTD policy effective 01/01/2015. You stopped working due to post laminectomy syndrome. You have been eligible for LTD benefits from 10/04/2017 through 10/04/2019, because you were unable to perform the duties of Your Occupation and from 10/05/2019 to 03/16/2021, because you were unable to perform the duties of Any Occupation.

The definition of Disability in your contract changed as of 10/04/2019. As of this date, you must be Disabled from Any Occupation to continue to receive LTD benefits.

Claim ID: 16921064

When we investigated whether you could perform the duties of Any Occupation, we considered your prior education, training and experience. The information you provided to us shows that you worked for Mtech Mechanical Technologies for approximately 17 years and have a high school diploma.

We reviewed all of the medical information in your file to decide if you continued to meet the definition of Disability from Any Occupation.

The most recent Attending Physician's Statement of Continued Disability signed by Dr. Halstrom on 02/18/2020 noted some functionality, indicating that you are unable to sustain effort or sit, stand, walk positions for more than 5-15 minutes, occasionally bend at waste, drive for less than 2 hours total, occasionally lift 8 lbs. and reach above/below shoulder, frequently fingering, keyboard, grip grasp and handle, and never kneel/crouch, climb or balance.

To determine if there was medical support for your continued disability, and to fully assess your level of functionality, we reviewed the medical records from all of your medical providers. The medical records were reviewed and it remained unclear if there was objective medical information to support the severity of your restrictions and limitations reported.

As part of our claims management and to document your current level of functionality, a surveillance investigation was performed on 05/26/2020 and 05/27/2020 and 07/06/2020 and 07/07/2020. During the course of the surveillance on 05/26/2020 from approximately 7:00 a.m. until 04:01 p.m., you were observed smoking cigarettes throughout the day, bending at the waist, walking and moving in a normal manner, without assistive devices, and without any apparent restrictions or limitations, carrying a cordless drill, scaling stairs, entering and exiting a a vehicle, driving, carrying 2 in. X 4 ft. pieces of wood and removing trash and other debris from garage and placing in dumpster, pulling and pushing lawn mower, mowing the lawn for 25 minutes, lifting 2 large panel ramps from the ground and tossing to the side, assembling a wheed whacker and weed whacking the yard, using a push broom, lifting and returning 2 panel ramps to a tool shed and finally returning the push lawnmower and weed whacker to the garage.

On 05/27/2020, from 7:00 a.m. to 3:00 p.m. you were observed walking and moving in a normal manner, without assistive devices, and without any apparent restrictions or limitations, using a garden hose to clean unidentified objects, working with bird feeders, using weed whacker to trim long grass around a public walking path, pulling a little red wagon, entering and exiting a a vehicle, driving and smoking cigarettes throughout the day.

On 07/06/2020 you exiting your residence on several occasions to smoke cigarettes, bending to the ground to extinguish a cigarette, smoking another cigarette, bending down to extinguish it and bending backward to strech back, and watering flowers.

On 07/07/2020 you were observed exiting your residence on several occasions to smoke cigarettes, use your hose to water flowers, carry an unknown item into the garage.

On 08/17/2020, Hartford Representative Jennifer Born interviewed you at your Attorney Leanne Miller's office in St. Cloud, Minnesota. During this interview, you stated that you are able to take care of small amounts of cooking, but even frying eggs and making toast can be too much, you can wash clothes but cannot iron any clothing, assist with cleaning a few dishes but this task can take you a couple of hours. You stated that you purchased a self-propelled lawn mower and a nice snow blower but these are becoming unmanageable and you expect you will have to have someone else do the work. You stated that you had computer skills when you worked but you cannot sit at a computer for any length of time and as a result could not full out the forms sent by Ms. Born as it would be too difficult. You stated you can drive up to 30 min. You stated that you are unable to work due to cervical radiculitis, nerve pain, neuralgia, post cervical laminectomy and cervical spondylitis. You stated you recently remodeled your house and has grab bars in the house and noted that your day consists of sitting until you have to stand and then sitting until you can no longer stand, lifting only 8 lbs. and you have difficulty with bending, twisting, reaching, squatting and kneeling due to pain. When asked about medical treatment you advised that you participate in physical therapy exercises at home on your own, you get radio frequency ablations every 6 months and injections once a month.

To assess the medical information received and following your interview, your file was reviewed by our Medical Case Manager (MCM). On 12/04/2020, our MCM forwarded a copy of the in-person statement obtained by Hartford Investigator Jennifer Born and the reports and video for surveillance discussed above, to Dr. Halstrom and Steven Vang for review and comment. Steven Vang deferred to Dr. Halstom for opinion. Dr. Halstrom did not respond to our requests.

To further clarify your functional ability, we referred your file for an Independent Medical Exam. In our referral, we included copies of the medical documents in your file, a copy of the in-person statement obtained by Hartford Investigator Jennifer Born and the reports and video for surveillance.

The Independent Medical Exam was completed by Dr. Harry Robinson, Orthopedic Surgeon on 02/01/2021. Dr. Robinson reviewed a copy of the in-person statement obtained by Hartford Investigator Jennifer Born and the reports and video for surveillance, your complete medical records as well as the medical forms previously completed by your Physicians. During the exam Dr. Robinson noted that ther were inconsistenciues in your claimed physical limitations. Dr. Robinson noted that you refused to sit in the exam chair for any length of time despire being onbserved on video being able to sit much longer than this. You reported that you are unable to work in any form, however, Dr. Robinson noted this is not capitible with the observed activieis in the video surveillance tape or with physical examination findings. Dr. Robinson thus concluded you are capable of the following:

- Stand 1 hr. at a time up to 5 hrs. total;
- Walk without restrictions up to 200 feet;
- Sit for 20 minutes at  a time with the ability to get up and move and then sit for another 20 minutes a total of 5 hrs. total;
- Use upper extremities without difficulty;
- Reach above shoulder, at desk level and below waist constantly; and
- No other activities that are restricted/limited.

Claim ID: 15621064

Using this information, a Vocational Rehabilitation Clinical Case Manager performed an Employability Analysis which showed that there are a number of occupations for which you are qualified that are within your physical capabilities. The salaries for these occupations are above 60% of your Indexed Pre-disability Earnings, which is $4,318.81 per month, as required by the definition of Any Occupation. Below is a listing of occupations prevalent in the National Economy for which you are qualified for:

| Occupation: | National Median Monthly Wage: |
|---|---|
| Manager, Branch | $9,592.00 |
| Employee Relations Specialist | $5,647.00 |
| Preventive Maintenance Coordinator | $5,989.00 |
| Manager, Employment Agency | $5,879.00 |
| Manager, Warehouse | $8,609.00 |
| Supervisor, Customer-Complaint Service | $5,011.00 |
| Title Searcher | $4,337.00 |

Based on this information, we have concluded that you are not prevented from performing the essential duties of Any Occupation. Because of this, you will not meet the policy definition of Disability as of 03/16/2021, and your LTD benefits will terminate on that date.

Below are guidelines that were relied upon in making this determination.

**Not Disabled Any Occupation Standard:**

On an ongoing basis, the Analyst should compare the:
- Policy definition of Disability; and
- Medical and vocational information

The Analyst should recommend a claim be terminated at or beyond Test Change when an:
- Employability Analysis Review (EAR) identifies occupation(s) that the employee is qualified to perform that are within the confirmed restrictions and limitations.

**Not Disabled Standard:**

On an ongoing basis, the Analyst should compare the:
- Policy definition of Total Disability;
- Essential Duties of the occupation; and
- Medical and vocational information

The Analyst should recommend a claim be denied or terminated when the analysis of all the medical and vocational information indicates that the claimant no longer meets the policy definition of Total Disability.

**Other Policy Provisions Standard:**

The Analyst should recommend a claim be denied or terminated when information obtained does not satisfy policy requirements for:
- Eligibility
- Proper Enrollment
- Coverage; or
- When information obtained satisfies a policy requirement for Termination of Payment.

All claims and appeals for disability benefits are to be adjudicated in a manner designed to ensure the independence and impartiality of the persons involved in making the decision.

The role of the Ability Analysts, Team Leaders, and Appeals Specialists is to undertake fair and accurate claims assessments with the goal of paying all valid claims. Financial self-interest, either the company's or that of the Claims or Appeals staff, must not influence individual claim management.

The Employee Retirement Income Security Act of 1974 (ERISA) gives you the right to appeal our decision and receive a full and fair review. You may appeal our decision even if you do not have new information to send to us. You are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim. If you do not agree with our denial, in whole or in part, and you wish to appeal our decision, you or your authorized representative must write to us within one hundred eighty (180) days from the later of receipt of the letter or the end of benefits. Your appeal letter should be signed, dated and clearly state your position. Please include your printed or typed full name, Policyholder, and at least the last four digits of your Social Security Number with your appeal letter (i.e. xxx-xx-1234). Along with your appeal letter, you may submit written comments, documents, records and other information related to your claim. If you would like us to consider information pertaining to your Social Security Disability claim, please provide it to us as soon as possible.

Once we receive your appeal, we will again review your entire claim, including any information previously submitted and any additional information received with your appeal. Upon completion of this review, we will advise you of our determination. Should the claim decision be upheld on appeal, you will then have the right to bring a civil action under Section 502(a) of ERISA, and the appeal decision will include notification of the date on which your right to bring a civil action expires under the Policy.

Please send your appeal letter to:

The Hartford
P.O. Box 14087
Lexington, KY 40512-4087
Fax: 855-339-7249

**IMPORTANT NOTICE ABOUT YOUR APPEAL DEADLINE DUE TO COVID-19:**

Due to COVID-19, your appeal deadline, as set forth in the attached letter, will be tolled from the period of March 1, 2020 until 60 days after the end of the National Emergency declaration. As of this time, the National Emergency has not ended. This means the days that you have to appeal will not be counted during this period.

Hartford Life and Accident Insurance Co. has policies and procedures in place to insulate the claims and appeals processes from any financial interest. Claims and appeals administrators are segregated from the financial department and do not have access to its financial information. The compensation of claims and appeals adjudicators has no relation to denial or termination rates, and Hartford Life and Accident Insurance Co. contracts with third-party vendors to engage experts to perform peer reviews of medical evidence and independent medical examinations rather than utilizing Hartford Life and Accident Insurance Co. employees in this capacity.

Si necesita ayuda con esta carta en español, póngase en contacto conmigo en 800-549-6514.

如果您阅读本信函需要中文普通话协助，请联系我，电话为 800-549-6514。

若您閱讀此信件時需要廣東話協助，請撥打 800-549-6514 聯絡我。

Kung kailangan mo ng tulong sa sulat na ito sa Tagalog, paki contact mo ako sa 800-549-6514.

Díí ak'iashchínii doo nił beehózingoo nika'adeeswoł. Shí nabo éí 800-549-6514. Shich'į' hwidííl'ní.

If you have any questions, please feel free to contact our office at 800-549-6514. Our office hours are 6:00 AM - 6:00 PM PST, Monday through Friday.

Sincerely,

*Kasie Kellar*

Kasie Kellar, Senior Ability Analyst
Hartford Life and Accident Insurance Co.

Benefit Management Services
Sacramento Disability Claim Office
The Hartford
P.O. Box 14302
Lexington, KY 40512-4302
800-549-6514
Fax (866) 411-5613



The Hartford
P.O. Box 14302
Lexington, KY 40512-4302

MB 02 000949 39867 H 7 A

ROY LENHARDT
2603 STEARNS WAY
SAINT CLOUD, MN 56303

PLEASE DO NOT DISCARD THIS PAGE AS THE REVERSE SIDE CONTAINS RETURN MAIL INFORMATION

CLAIM ID:
SPECIAL HANDLING CODE:
INSERT NUMBER:

The Hartford
P.O. Box 14302
Lexington, KY 40512-4302



The Hartford
P.O. Box 14302
Lexington, KY 40512-4302

**THE HARTFORD**

SP 02 000093 20956 I 2 BSNGLP

LEANNE MILLER
REICHERT WENNER P.A.
616 ROOSEVELT ROAD,
SUITE 100
SAINT CLOUD, MN  56301

RECEIVED MAR 3 0 2022



PLEASE DO NOT DISCARD THIS PAGE AS THE REVERSE SIDE CONTAINS RETURN MAIL INFORMATION

CLAIM ID: ▮▮▮▮▮▮
SPECIAL HANDLING CODE: ▮▮▮▮▮▮
INSERT NUMBER:



EXHIBIT
*tabbies*
**B**

The Hartford
P.O. Box 14302
Lexington, KY 40512-4302



**THE HARTFORD**

000093 2/8

March 24, 2022

Leanne Miller
Reichert Wenner P.A.
616 Roosevelt Road,
Suite 100
Saint Cloud, MN 56301

| | |
|---|---|
| Policy Holder: | Mtech Mechanical Technologies Group, Inc. |
| Claimant: | Roy Lenhardt |
| Insured ID: | |
| Policy Number: | |

Dear Attorney Miller:

We have completed our comprehensive appeal review and determined the decision to terminate LTD benefits must be upheld on appeal. Our appeal review was independent and conducted separately from the individuals who made the original decision and without deference to that decision.

Please refer to the March 16, 2021 letter from Kasie Kellar, indicating Mr. Lenhardt is no longer entitled to Disability benefits beyond March 16, 2021. That decision was based upon a complete review of the information in Mr. Lenhardt's claim file. Ms. Kellar's letter lists specific evidence relied upon from the claim file and includes definitions of the applicable Policy provisions cited in the adverse benefit determination. We received your appeal letter on September 14, 2021, requesting a review of the termination of benefits.

Our appeal decision is based upon our full and fair review of Policy language, Hartford Guidelines and all documents contained in Mr. Lenhardt's claim file, viewed as a whole.

Our decision also considered the following new information:

- Your appeal letter dated 9/9/2022.
- Records from: Integrated Diagnostics, Colorado Imaging, Touchstone Imaging, South Denver Spine, Parker Adventist Hospital, Comprehensive Pain Specialist (exhibits 1-6), Select Physical Therapy, UC Health Steadman Hawkins PT and Rehab, Simon Med, St Cloud Orthopedic, Center for pain management, Williams Integrecare Clinic, Dr. Mark Halstrom.
- You also submitted duplicates of much of the medical records already in the claim file.
- Independent Medical Record Review completed by Candice Williams, M.D., Diplomate, American Board of Anesthesiology,

Benefit Management Services
Sacramento Disability Claim Office
The Hartford
P.O. Box 14302
Lexington, KY 40512-4302
800-549-6514
Fax (866) 411-5613

Claim ID: 15921064

- Board Certified in Anesthesiology & Pain Medicine dated 10/19/2021.
- Employability Analysis Addendum Report completed by Certified Rehabilitation Counselor, Tresa LeVasseur, MA dated 10/25/2021.
- Your letter dated 11/17/2021.
- Vocational assessment dated 11/17/2021 by James Miller, M.Ed., CRC.
- CT Abdomen 10/15/2021.
- Occipital Nerve blocks 11/11/2021, 8/23/2021.
- Trigger point injections trapezius, cervical paraspinals, thoracic paraspinals 8/23/2021.
- Office visit notes dated 11/9/2021, 10/8/2021, 9/8/2021, 8/13/2021 by Stephen Vang PAC.
- Sacrococcygeal joint steroid injection 10/19/2021.
- Your letter dated 12/1/2021 requesting an additional 30 days to respond to share tolling.
- Your letter dated 12/17/2021 letter requesting an additional 30-45 days to respond to share tolling.
- Your letter dated 1/11/2022 including records from St Cloud Ortho. You noted Mr. Lenhardt would be undergoing surgery 1/21/2022 and will submit records from that procedure.
- Phone call with you dated 2/15/2022 in which you requested additional time to supplement claim file.
- Your letter dated 2/17/2022, including Operative Report dated 1/20/2022 (Rt Knee Surgery).
- Independent Medical Record Review Addendum completed by Candace Williams, M.D., Diplomat, American Board of Anesthesiology, Board Certified in Anesthesiology & Pain Medicine dated 3/1/2022.
- Your letter dated 3/22/2022 requesting a prompt final appeal determination.

According to our records, Mr. Lenhardt has been out of work since April 5, 2017 due to complaints associated with neck and low back pain. Prior to leaving work, Mr. Lenhardt was employed as a Human Resources/Controller. Mr. Lenhardt received LTD benefits for the period beginning October 4, 2017 through March 16, 2021 as it was determined he was prevented by disability from performing one or more of the essential duties of any occupation. Thereafter, it was concluded Mr. Lenhardt is qualified and capable of performing suitable alternative sedentary and light duty occupations and thus, no longer satisfies the Policy definition of Disability. The decision to terminate LTD benefits was based in part on medical records and statements of function provided by Mr. Lenhardt's medical providers, Dr. Halstrom, Steadman Hawkins Clinic Denver, Dr. Barnhart, Dr. Mehlberg, Dr. Elghor, St. Cloud Orthopedic, Center for Pain Management, Dr. Breyer; as well as surveillance evidence and accompanying reports obtained on May 26, 2020, May 27, 2020 and July 6, 2020 and July 7, 2020; a Claimant Interview with Hartford Investigator Jennifer Born on August 17, 2020; an Independent Medical Exam completed on July 1, 2019 by Dr. Orrin Mann, Board Certified in Occupational, Environmental and Preventative Medicine, with clarification signed by Dr. Mann on July 23, 2019; an Independent Medical Exam completed on February 1, 2021 by Dr. Harry Robinson, Orthopedic Surgeon; as well as review by a Clinical Case Manager on July 25, 2019 and March 4, 2021; and an Employability Analysis completed by Certified Rehabilitation Counselor, Tresa LeVasseur, MA on March 11, 2021.

Claim ID: 15921064

The decision to terminate LTD benefits was explained to Mr. Lenhardt via letter dated March 16, 2021 from Kasie Kellar. As indicated, an Attending Physician's Statement of Continued Disability signed by Dr. Halstrom on February 18, 2020 noted some functionality, indicating Mr. Lenhardt was unable to sustain effort or sit, stand, walk positions for more than 5-15 minutes. It was noted Mr. Lenhardt is able to occasionally bend at waste, drive for less than 2 hours total, occasionally lift 8 pounds and reach above/below shoulder, frequently fingering, keyboard, grip grasp and handle and never kneel/crouch, climb or balance.

It was noted that it remained unclear if there was objective medical information to support the severity of restrictions and limitations being reported. The Disability Claims Office arranged a surveillance investigation to document Mr. Lenhardt's current level of functionality in May and July 2020. During the course of the surveillance on May 26, 2020 from approximately 7:00 a.m. until 04:01 p.m., Mr. Lenhardt was observed smoking cigarettes throughout the day, bending at the waist, walking and moving in a normal manner, without assistive devices and without any apparent restrictions or limitations, carrying a cordless drill, scaling stairs, entering and exiting a vehicle, driving, carrying 2X4s (pieces of wood) and removing trash and other debris from garage and placing in dumpster, pulling and pushing lawn mower, mowing the lawn for 25 minutes, lifting 2 large panel ramps from the ground and tossing to the side, assembling a weed whacker and weed whacking the yard, using a push broom, lifting and returning 2 panel ramps to a tool shed and finally returning the push lawnmower and weed whacker to the garage.

On May 27, 2020 from 7:00 a.m. to 3:00 p.m. Mr. Lenhardt was observed walking and moving in a normal manner, without assistive devices and without any apparent restrictions or limitations, using a garden hose to clean unidentified objects, working with bird feeders, using weed whacker to trim long grass around a public walking path, pulling a little red wagon, entering and exiting a vehicle, driving and smoking cigarettes throughout the day.

On July 6, 2020 Mr. Lenhardt was observed exiting his residence on several occasions to smoke cigarettes, bending to the ground to extinguish them, as well as stretching and watering flowers. On July 7, 2020 Mr. Lenhardt was observed exiting his residence on several occasions to smoke cigarettes, use the hose to water flowers and carrying an unknown item into the garage.

On August 17, 2020, Hartford Representative Jennifer Born interviewed Mr. Lenhardt at your office in St. Cloud, Minnesota. During this interview, Mr. Lenhardt stated he is able to take care of small amounts of cooking, but noted that even frying eggs and making toast can be too much. Mr. Lenhardt noted he can wash clothes but cannot iron any clothing, he can assist with cleaning a few dishes but this task can take him a couple of hours. Mr. Lenhardt stated that he purchased a self-propelled lawn mower and a nice snow blower but these are becoming unmanageable and he expects he will have to have someone else do the work. Mr. Lenhardt stated that he had computer skills when he worked but that he cannot sit at a computer for any length of time and as a result, he could not fill out the forms sent by Ms. Born as it would be too difficult. Mr. Lenhardt stated he can drive up to 30 minutes. He stated he is unable to work due to cervical radiculitis, nerve pain, neuralgia, post cervical laminectomy and cervical spondylitis. Mr. Lenhardt stated he recently remodeled his house and has grab bars in the house and noted that his day consists of sitting until he has to stand and then sitting until he can no longer stand. Mr. Lenhardt noted he can lift only 8

Claim ID: 15921064

pounds and has difficulty with bending, twisting, reaching, squatting and kneeling due to pain. When asked about medical treatment, Mr. Lenhardt advised he participates in physical therapy exercises at home on his own and that he gets radio frequency ablations every 6 months and injections once a month.

Subsequently, the case was reviewed by a Medical Case Manager (MCM), who on December 4, 2020 forwarded a copy of the Claimant Interview, video surveillance and accompanying reports to Dr. Halstrom and Steven Vang for review and comment. Dr. Vang deferred to Dr. Halstom for opinion, but Dr. Halstrom did not respond.

The Disability Claims Office then arranged for Mr. Lenhardt to undergo an Independent Medical Examination (IME), which was completed by Dr. Harry Robinson, Orthopedic Surgeon on February 1, 2021. Dr. Robinson reviewed a copy of the Claimant Interview, video surveillance and medical records in Mr. Lenhardt's claim file. Dr. Robinson noted there were inconsistencies with the claimed physical limitations. Dr. Robinson noted Mr. Lenhardt refused to sit in the exam chair for any length of time despite being observed on video being able to sit much longer than this. Mr. Lenhardt reported he was unable to work in any form. However, Dr. Robinson opined this is not compatible with the observed activities on video surveillance or with physical examination findings. Dr. Robinson thus concluded the following restrictions and limitations are appropriate:

- Stand 1 hr. at a time up to 5 hours total;
- Walk without restrictions up to 200 feet;
- Sit for 20 minutes at a time with the ability to get up and move and then sit for another 20 minutes a total of 5 hours total;
- Use upper extremities without difficulty;
- Reach above shoulder, at desk level and below waist constantly;
- No other activities that are restricted/limited.

Based on the restrictions and limitations identified by Dr. Robinson, an Employability Analysis identified the following suitable alternative sedentary and light occupations for which Mr. Lenhardt is qualified and capable of performing:

| Occupation: | National Median Monthly Wage: |
|---|---|
| Manager, Branch | $9,592.00 |
| Employee Relations Specialist | $5,647.00 |
| Preventive Maintenance Coordinator | $5,989.00 |
| Manager, Employment Agency | $5,879.00 |
| Manager, Warehouse | $8,609.00 |
| Supervisor, Customer-Complaint Service | $5,011.00 |
| Title Searcher | $4,337.00 |

In view of the above, it was concluded Mr. Lenhardt is no longer prevented from performing the essential duties of Any Occupation and as a result, the claim was terminated effective March 17, 2021.

On appeal, you maintain Mr. Lenhardt meets the Policy definition of Disability because his various medical conditions prevent him from performing the essential duties of any occupation. You argue that any attempts by Mr. Lenhardt to perform even normal household duties has resulted in immense physical and psychological anguish due to both his inability to function normally and the immense pain caused in the actual physical attempt. In your 22-page appeal letter, you provide a lengthy summary of Mr. Lenhardt's medical treatment from 2004 through present. While your medical treatment summary was reviewed and considered, it will not be repeated in detail in this correspondence.

You argue Mr. Lenhardt remains disabled under the LTD Policy due to spinal stenosis; post laminectomy syndrome; degenerative disc disease; central facet arthropathy; occipital neuralgia; chronic obstructive pulmonary disease; and severe depression. Because of these conditions, you argue Mr. Lenhardt has suffered from immense pain; loss of mobility and functionality of his body; and frequent bouts of severe sadness and hopelessness. You assert that in instances where Mr. Lenhardt is able to function, no matter how brief, any attempts to undertake normal physical activity have long lasting negative ramifications that result in him being non-functioning for days later.

You note Mr. Lenhardt was approved for SSDI benefits effective November 10, 2017.

You assert that contrary to the Independent Medical Examiner who reviewed Mr. Lenhardt's claim for long-term disability benefits, the specialists who examined and treated Mr. Lenhardt on an ongoing basis considered the significant symptoms of Mr. Lenhardt, such as his inability to lift, carry, sit, rotate his neck, or work due to his immense neck, shoulder, back, and posterior pain. You feel the IME was not sufficient to evaluate Mr. Lenhardt's severe chronic pain. You believes the IME provider did not conduct a thorough analysis of Mr. Lenhardt's medical records or document symptoms beyond a very selective and cursory understanding of Mr. Lenhardt's medical history. Thus, you believe the IME provider's opinions must yield to those practitioners whose analyses did account for Mr. Lenhardt's symptoms in a more holistic and detailed scope. You assert Mr. Lenhardt forces himself to undergo constant treatment to manage his pain, but these treatments provide only momentary relief and as the effects of these treatments wear off, Mr. Lenhardt consistently returns to a state of utter debilitation and constant scorching pain radiating from his neck down to his posterior. You note that the mere act of Mr. Lenhardt mowing the lawn, results in debilitation the very next day.

You note the IME physician ignored the fact that chronic pain manifests inconsistently, noting that all conclusions based on the IME asserting that Mr. Lenhardt can tolerate more activity than he claims imply that he should and ought to put himself through hellish agony to satisfy work-related requirements.

You assert that The Hartford's reliance on surveillance footage is both disingenuous and incomplete. You argue that the IME physician blatantly ignores the fact that Mr. Lenhardt had just received trigger point injections to alleviate his symptoms two weeks prior to the surveillance footage. Therefore, you maintain all information gleaned through this surveillance footage is

viewing Mr. Lenhardt in a stage of slight pain relief. You opine Mr. Lenhardt still appeared to be in severe pain and showed signs of severely restricted movement.

You opine nothing in the surveillance footage supports the IME physician's assertions that this evidence is damning to Mr. Lenhardt's status as a disabled individual. You believes the "rushed conclusions" further illustrate the obvious bias of The Hartford's medical examiner against individuals suffering through chronic pain while attempting to live a semi-normal life, such as Mr. Lenhardt.

Despite the fact that surveillance was obtained on consecutive days, you note that observed instances of yard work and functionality by Mr. Lenhardt fail to show the aftermath of such activities, where he is unlikely to be capable of getting out of bed the next day. You argue that The Hartford ought not to have substituted the limited judgments of a biased medical consultant for those who saw Mr. Lenhardt on a more regular basis and considered his full symptoms in assessing his psychological, emotional, and physical ability to function in any occupational capacity. It should be noted that Mr. Lenhardt's own providers were given the opportunity to review and comment on surveillance footage, but declined to do so.

You challenge the credibility of The Hartford's Employability Analysis because it relies upon the February 22, 2021 IME completed by Dr. Robinson, M.D., which you believe was "overly critical, unsurprisingly cherry-picked, and based heavily on subjective observations of the doctor and the surveillance footage acquired by The Hartford." Since you believe the analysis is based on a flawed premise that Mr. Lenhardt is capable of full-time employment, you find all conclusions drawn upon such a flawed premise are moot.

You conclude by noting Mr. Lenhardt continues to struggle with chronic and severe neck, upper-back, lower-back, shoulder, and tailbone pain; degenerative disc disease; occipital neuralgia; chronic obstructive pulmonary disease; and depression, which substantially restrict his ability to perform his former and any occupation. Therefore, you assert The Hartford erred when they agreed with the "incomplete and inaccurate analysis of their medical consultant" in denying Mr. Lenhardt's long term disability benefits. Rather, you argue that the more complete record and analysis provided by Mr. Lenhardt's providers make it clear that he is unable to perform the essential duties of any occupation. Thus, you argue Mr. Lenhardt remains totally disabled under The Hartford's Policy.

As part of the appeal review, we determined additional clinical review was warranted on appeal. Therefore, all medical documentation in Mr. Lenhardt's claim file was forwarded to Brown & Brown Insurance (B&B) to arrange an Independent Medical Record Review by a physician Board Certified in Pain Management. B&B was also provided with a copy of the surveillance videos, accompanying reports and Claimant Interview. B&B was asked to review the information described above, address several questions/issues relating to Mr. Lenhardt's condition and level of function. B&B was asked to consider Mr. Lenhardt's subjective complaints in addition to any objective findings. B&B was asked to review and consider the surveillance video evidence, but instructed not to place undue weight upon the footage.

Claim ID: 15921064

B&B arranged to have the case reviewed by Candace Williams, M.D., Diplomat, American Board of Anesthesiology, Board Certified in Anesthesiology & Pain Medicine.  Dr. Williams summarized her findings in a report dated October 19, 2021.

As part of her review, Dr. Williams acknowledged Mr. Lenhardt has an extensive history of cervical radiculopathy, musculoskeletal pain, low back pain and chronic neck pain status post C3-C6 ACDF in 2015 with persistent neck pain, musculoskeletal pain, fatigue and a long history of seeing multiple providers for his pain complaints.  Dr. Williams noted Mr. Lenhardt has had upwards of 25 radiofrequency ablation procedures in the cervical region and multiple interventional procedures in the head and neck as well as the low back for which he had lumbar transforaminal injections and sacrococcygeal blocks for tailbone pain.  He has an extensive use of physical therapy and medications to manage his pain.  Per his extensive patient questionnaire, Mr. Lenhardt detailed how his pain affects his ability to perform activities of daily living, stating he is able to do some household chores including laundry, cooking and some yard work but for limited amounts of time.  Dr. Williams noted that according to his questionnaire, Mr. Lenhardt feels his health declined after his cervical surgery, which he noted involved a large scar, and described it as a crater with a clump of muscle near his T1 region.  In his orthopedic consultations Mr. Lenhardt's hardware and fusion is noted to be intact according to Dr. Williams.

In light of this, Dr. Williams noted there are many reports of Mr. Lenhardt's restrictions and limitations presented in the claimant's questionnaire, medical office visits, AP statements, FCE evaluations and IME Reports along with surveillance data.  Dr. Williams considered restrictions and limitations recommended by Dr. Halstrom, Dr. Barnhardt as well as those identified by Independent Medical Examiner, Dr. Orin Mann in July 2019 and more recently by Dr. Harry Robinson in February 2021.  Dr. Williams also weighed the opinions of Filip Johnson, Therapist, who completed a Functional Capacity Evaluation on Mau 18, 2021 and finally, weighed the results of video surveillance evidence obtained in May and July 2020.  Based on a review of all available medical evidence, Mr. Lenhardt's subjective complaints and investigative materials, Dr. Williams opined within reasonable certainty that from the time period beginning March 17, 2021 through present, Mr. Lenhardt has the following restrictions and limitations:

- He is able to walk and bend at the waist
- He can stand up to an hour at a time for a total of 5 hours per 8 hour workday
- He can sit for 20 minutes at a time with the ability to get up and move about then sit for another 20 minutes for a total of 5 hours per 8 hour workday
- He can carry/push/pull occasionally up to 20 lbs. at waist, chest and overhead occasionally
- He can lift up to 20 lbs. frequently
- He can use his upper extremities to reach above shoulder height, reach at desk level and below waist constantly
- He can use his fingers and hands to handle, finger and feel constantly
- He must have opportunity to change position as needed for comfort, semi reclining chair with adjustable headset, headset for calls, sit/stand workstation that is ergonomically adjusted and computer display that can been seen in a neutral position
- The claimant should not perform tasks that require prolonged neck flexion or extension as these can exacerbate pain complaints

- The claimant should not climb ladders, heights, operate heavy machinery or be exposed to vibration

Dr. Williams opined Mr. Lenhardt is able to maintain functional capacity with the above restrictions and limitations for eight hours per day and for five days per week. Dr. Williams expects these restrictions and limitations would be in place for the foreseeable future as Mr. Lenhardt's condition is chronic and is not currently improving. Finally, when asked to comment on whether or not Mr. Lenhardt's use of prescription medications warrants any additional restrictions and limitations, Dr. Williams noted: "Given the claimant's reports of having short term memory problems and memory problems due to medications and lack of sleep reported, the claimant should not climb ladders, heights, operate foot controls or heavy machinery."

In order to give all due consideration to Dr. Williams recommended restrictions and limitations, we arranged to have an Employability Analysis Addendum completed to determine whether the newly identified limitations would preclude Mr. Lenhardt from performing the previously identified alternative occupations, or to determine whether any additional alternative occupations can be identified. The Employability Analysis Addendum Report completed by Certified Rehabilitation Counselor, Tresa LeVasseur, MA dated October 25, 2021 determined Mr. Lenhardt is qualified and capable of performing the following alternative occupations:

| Occupation | Mean Wage |
|---|---|
| Manager, Branch | $9,849.00 |
| Employee Relations Specialist | $5,786.00 |
| Preventive Maintenance Coordinator | $6,091.00 |
| Manager, Employment Agency | $7,511.00 |
| Manager, Warehouse | $8,759.00 |
| Supervisor, Customer-Complaint Service | $5,167.00 |
| Title Searcher | $4,411.00 |

Under cover of our letter dated October 27, 2021, we shared with you a copy of Dr. Williams' Independent Medical Record Review dated October 19, 2021 and the Employability Analysis Addendum dated October 25, 2021. You were provided with the opportunity to review and respond to this newly generated information with any additional information or arguments you saw fit. You were provided until November 17, 2021 to supplement your appeal as indicated. You requested several extensions Between November 2021 and February 2022 to supplement Mr. Lenhardt's claim file and appeal. These requests were accommodated and you supplemented the claim file with additional information listed above.

The additional medical records you submitted for consideration were forwarded to B&B for consideration by Dr. Williams. Dr. Williams was asked to review these records and identify whether or not they alter in any way, the opinion she rendered in her original report dated October 19, 2021. Dr. Williams was asked to summarize her findings in an Addendum Report.

You also provided a response to the October 25, 2021 Employability Analysis Addendum, which was completed by Vocational Rehabilitation Consultant, James Miller, M.Ed. dated November 17,

Claim ID: 15921064

000093  6/8

2021. Mr. Miller asserts: "Dr. Williams indicates that she does not take into account the valid Functional Capacity Assessment, nor the return to work guidelines and recommendations provided by the claimant's physician, Dr. Halstrom." Mr. Williams' statement is completely false. Dr. Williams described in detail the restrictions and limitations identified by the Functional Capacity Evaluation completed by Filip Johnson, Therapist on May 18, 2021. She also explained in detail why she felt the restrictions and limitations are not supported by the physical examination findings in that examination and why the examination is inconsistent with other examinations available for review. Specifically, Dr. Williams noted there is no description of how cervical strength was measured and how this was graded as 3-/5, but graded as normal in other examinations. Dr. Williams also noted the FCE graded lower extremity strength as 4+/5 which is inconsistent with other examinations that graded strength as 5/5 consistently in the lower extremities. Further, Dr. Williams noted that rating functional strength as 3/5 with the inability to squat without usage of hands is inconsistent with other reports of strength.

Dr. Williams also addressed in detail Dr. Halstrom's opinions regarding Mr. Lenhardt's functional abilities. Dr. Williams indicated that in office visits with Dr. Halstrom, Mr. Lenhardt's complaints of chronic neck pain were consistent and noted to persist despite reports that his neck felt better after various procedures. Of note, Dr. Williams pointed out that there were no physical examination findings of the upper or lower extremities in terms of strength, range of motion, sensation or deep tendon reflexes noted. She noted Mr. Lenhardt was observed moving frequently during his office visits due to discomfort and pain scores were noted to be 6/10 on the visual analog scale and above. However, Dr. Williams noted there are no physical examination findings, testing or imaging in the records with Dr. Halstrom that support the restrictions and limitations listed by the provider.

For Mr. Miller to assert that Dr. Williams herself indicated she did not take into consideration the FCE results of the opinions of Dr. Halstrom is completely false. Dr. Williams acknowledged and documented the findings of the FCE and by Dr. Halstrom and then explained in detail why she did not accept those restrictions and limitations in view of other conflicting evidence such as other provider records and direct observation via video surveillance or by the IME examiner.

By contrast, Mr. Miller appears to accept all of Mr. Lenhardt's self-reported limitations. Mr. Miller notes: "Mr. Lenhardt states that he is unable to maintain concentration and pace throughout the day without frequent breaks and need to change positions. These would include the ability to lay down and completely move away from his workstation in an attempt to reduce his pain complaints. This would be beyond the accommodation of positional flexibility at work and would impact on the ability to complete duties assigned in the workplace." While we acknowledge Mr. Lenhardt does not believe he is capable of returning to any degree of work, the record includes examples of Mr. Lenhardt functioning at levels greater than he or Dr. Halstrom, or FCE provider, Filip Johnson suggest. For example, Dr. Halstrom and Mr. Johnson maintain Mr. Lenhardt can only lift/carry five pounds, but neither addressed surveillance evidence which documented Mr. Lenhardt lifting and carrying 2X4 pieces of lumber or panel ramps. As noted previously, Dr. Halstrom was provided the opportunity to review and respond to the surveillance videos and accompanying reports and the Claimant Interview, which appear to reveal inconsistencies in Mr. Lenhardt's reported limitations, but he declined. It is also unclear whether Mr. Miller reviewed Mr. Lenhardt's Claimant Interview

Claim ID: 15921064

or the surveillance and investigative material. Since he seemingly grants great weight to Mr. Lenhardt's subjective complaints, it would appear valuable for him to have had the opportunity to review Mr. Lenhardt's observed activities. In view of the above, we believe Mr. Miller's opinions are not reflective of the great weight of the available evidence. For this reason, we believe the Employability Analysis Addendum completed by Certified Rehabilitation Counselor, Tresa LeVasseur, MA dated October 25, 2021 is more reflective of the great weight of the available evidence and in turn, of Mr. Lenhardt's occupational capabilities.

In her Addendum report dated March 1, 2022, Dr. Williams noted Mr. Lenhardt has continued treatment with his pain management physician for headaches, neck pain, thoracic pain, sacrococcygeal and low back pain. His pain complaints were consistent with previous, and he was treated with medications and interventional procedures with continued chronic pain, according to Dr. Williams. More recently in the past 6 months, it was noted Mr. Lenhardt developed right knee pain without a preceding injury. He was treated with right knee surgery in January 2022 and per follow up notes, is healing well with no neurologic deficits except mild decreased sensation on the anterior shin and foot. Dr. Williams notes Mr. Lenhardt is still in the post-surgical period, and as such, is adhering to the treatment plans of the surgeon, which include a hinged knee brace when walking and maintaining his right knee in 0-90 degrees for 6 weeks since his last visit on February 2, 2022. Per the medical notes provided, Mr. Lenhardt's right knee is healing well and he is having a standard post-surgical course.

Dr. Williams opined Mr. Lenhardt is able to maintain functional capacity with the restrictions and limitations she provided in her original report. Given Mr. Lenhardt's reports of having short term memory problems and memory problems due to medications and lack of sleep, she opined Mr. Lenhardt should not climb ladders, heights, operate foot controls or heavy machinery. Dr. Williams provided the following remarks:

> In reviewing the most recent medical records provided, my opinions regarding the claimant's restrictions and limitations are unchanged from the prior report. In regard to the claimant's ability to perform functions with his right lower extremity, in light of his more recent post-surgical course, usage of the right lower extremity should be in accordance with the recommendations of Dr. Hultman, the treating Orthopedic Surgeon. Office visit notes dated 2/2/22 state the plan is for the claimant to remain in a hinged brace during walking and remain in 0 — 90 degrees for 6 weeks. In my professional opinion, the claimant is able to adhere to the above listed restrictions and limitations while wearing a hinged knee brace with walking and maintaining his knee in a 0–90-degree range of motion as recommended by his Orthopedic Surgeon.

Once again, under cover of our letter dated March 2, 2022, we shared with you a copy of Dr. Williams' Independent Medical Record Review Addendum dated March 1, 2022. You were provided with the opportunity to review and respond to this newly generated information with any additional information or arguments you saw fit. You were provided until March 23, 2022 to supplement your appeal as indicated.

Claim ID: 15921064

Subsequently, you submitted a letter dated March 23, 2022 in which you maintain Dr. Williams' March 1, 2022 report is ambiguous and does not accurately reflect the most recent treatment and restrictions that have been placed on Mr. Lenhardt from his treating medical providers. You note that Dr. Williams states that restrictions for the lower extremity should be deferred to Dr. Hultman (January 2022 knee surgeon), but then goes on to state Mr. Lenhardt could still perform within the restrictions that she has identified. You believe "Basic common-sense dictates that cannot be the case." You conclude "Clearly, the Hartford has no intentions of reviewing the evidence in this case in a fair and impartial manner and is acting in bad faith in its denial of this claim." In view of the above, you instructed The Hartford to proceed with issuing a prompt decision in this matter.

It should be noted that the restrictions and limitations in place as a result of Mr. Lenhardt's recent January 2022 knee surgery are not relevant to the time period under review in this appeal. As indicated, LTD benefits were terminated as of March 17, 2021. Accordingly, the new restrictions and limitations in place following Mr. Lenhardt's January 2022 knee surgery by Dr. Hultman are beyond the scope of this appeal review, in particular because we have determined Mr. Lenhardt no longer satisfied the Policy definition of Disability beyond March 16, 2021, approximately ten months earlier.

The great weight of the medical evidence available for review indicates Mr. Lenhardt was qualified and capable of performing suitable alternative occupations as of March 17, 2021. Specifically, Dr. Williams failed to identify any restrictions and limitations that would preclude Mr. Lenhardt from performing the alternative occupations identified by The Employability Analysis conducted by Certified Rehabilitation Counselor, Tresa LeVasseur, MA. In addition, there is consensus among an Independent Medical Examiner, Dr. Orrin Mann, Board Certified in Occupational, Environmental and Preventative Medicine, who conducted a hands-on examination of Mr. Lenhardt and an Independent Medical Record Reviewer, Candice Williams, M.D., Diplomate, American Board of Anesthesiology, Board Certified in Anesthesiology & Pain Medicine, who agree Mr. Lenhardt possesses functional abilities which would allow him to perform suitable alternative occupations, which have been identified. Accordingly, it is evident Mr. Lenhardt no longer satisfied the Policy definition of Disability as of March 17, 2021 and the decision to terminate LTD benefits at that time must be maintained on appeal.

We are aware Mr. Lenhardt has been approved for Social Security Disability Income (SSDI) benefits. It is possible to qualify for SSDI, but no longer continue to qualify for private LTD benefits from The Hartford. The standards governing receipt of these public and private benefits are different in critical ways. In determining entitlement to SSDI, the Social Security Administration (SSA) measures your condition against a unique set of federal criteria. By contrast, the continuing validity of a claim to benefits under a private LTD Policy depends in part on the interpretation of the specific terms in the Policy. Therefore, while The Hartford considers the SSA's disability determination as one piece of relevant evidence, the SSA's determination is not conclusive. The LTD Policy is a contract that must be consistently enforced according to its terms. In particular, after one has received benefits for 2 years following the elimination period, the definition of Disability under the LTD Policy changes from reliance upon the ability to perform any duties of one's regular occupation to reliance upon the ability to engage in any gainful occupation.

Claim ID: 15921064

The SSA may also weigh subjective evidence differently. For example, because the SSA gives full deference to a treating physician, if a claimant subjectively reports certain restrictions or pain levels which are included in the treating physician's assessment, those subjective complaints may carry a greater weight in an SSA determination than in The Hartford's determination.

Medical evidence in the SSA's possession and The Hartford's possession may be different. The decisions may be made with overlapping, but distinct, sets of medical evidence. In addition to medical evidence, The Hartford's decision is based on vocational evidence which the SSA is not required to use in the same way. The Social Security guidelines treat advancing age (ages 50 and older) as an increasingly limiting factor in a worker's ability to adjust to other work. Mr. Lenhardt's LTD Policy does not include age as a factor in the definition of Disability. For example, in instances that involve the transferability of skills for older claimants, the SSA regulations permit and specify a more limited analysis than The Hartford's policies.

It is impossible to determine how the Social Security Administration would have ruled on Mr. Lenhardt's case had they had access to the same evidence that was available to Hartford, such as the Independent Medical Examination or surveillance and investigative materials obtained by the Disability Claims Office, or the Independent Medical Record Review obtained as part of the appeal investigation. The SSA conducts follow-up disability reviews every one, three, or five years, depending on the diagnosis; while The Hartford generally conducts follow-up disability reviews every year, if not more frequently, depending on factors including anticipated improvement or decline in an individual's functionality. Mr. Lenhardt's LTD claim file contains current medical evidence received after the SSA rendered its decision in November 2017.

Finally, the SSA does not conduct analysis of skills that may be transferrable to other occupations, while The Hartford does a transferrable skill analysis to determine whether an individual's prior experience and skill set would allow him/her to perform an occupation with minimal on-the-job training.

We have considered the arguments presented on appeal, but based on the great weight of the evidence available for review, we are unable to reverse our prior position on the matter.

You are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to this claim. You have the right under Section 502(a) of ERISA to bring a civil action disputing this adverse benefit decision. Although the Policy's Legal Actions provision contractually limits the time within which you may file such a civil action to no more than 3 years after the date Proof of Loss is required under terms of the Policy, we hereby extend the time for you to file a civil action disputing this adverse benefit decision to no later than March 24, 2025, which is 3 years from the date of this appeal decision.

Please be advised that our claim decision is now final as administrative remedies available under the Policy have been exhausted.

Si necesita ayuda con esta carta en español, póngase en contacto conmigo en (800) 549-6514.

如果您阅读本信函需要中文普通话协助，请联系我，电话为 (800) 549-6514。

若您閱讀此信件時需要廣東話協助，請撥打 (800) 549-6514 聯絡我。

Kung kailangan mo ng tulong sa sulat na ito sa Tagalog, paki contact mo ako sa (800) 549-6514.

Díí ak'iashchíníí doo nił beehózingoo nika'adeeswoł. Shí nabo éí (800) 549-6514. Shich'į' hwidííl'ní.

If you have any questions or concerns, I can be reached directly at (860) 547-5489.

Sincerely,

Chris B. Davis,
Appeal Specialist
Hartford Life and Accident Insurance Co.

Benefit Management Services
Sacramento Disability Claim Office
The Hartford
P.O. Box 14302
Lexington, KY 40512-4302
800-549-6514
Fax (866) 411-5613

Claim ID: 15921084